## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20105-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

DOUGLAS ARNOLDO CHAVEZ,

     *Defendant*.

_____/

## REPORT AND RECOMMENDATION ON
## <u>DEFENDANT'S MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE</u>

This matter is before the Court on Defendant's motion to suppress evidence seized in violation of the Fourth Amendment to the Constitution of the United States of America (the "Motion"). [D.E. 28]. The Government filed its response on October 12, 2022. [D.E. 37]. Defendant did not file a reply and the time to do so has since passed, however, the Court held a hearing on the Motion on October 31, 2022. Thereafter, the parties submitted supplemental briefing with the Court's leave. [D.E. 42, 43]. Accordingly, the Motion is now ripe for disposition. Having reviewed the briefing and relevant authorities, and otherwise being fully advised in the premises, the Court recommends that the Motion be **DENIED**.[1]

---

[1]     On September 26, 2022, the Honorable Darrin P. Gayles referred the Motion to the Undersigned Magistrate Judge for disposition. [D.E. 29].

## I.     FACTUAL BACKGROUND

On Friday, February 11, 2022, Douglas Chavez arrived home from work to find two law enforcement agents waiting outside.  Chavez was expecting them.  The agents stopped by earlier that day to interview Chavez but instead met his stepfather, with whom Chavez resided.  Chavez's stepfather informed the agents of the general area where Chavez worked, which prompted the agents to look for Chavez there. Their search was unsuccessful, however, and so the agents returned to Chavez's residence and waited for him.  At some point in time before Chavez arrived home, either his stepfather or his mother – who also shared their small apartment – notified Chavez that the agents were looking for him.

Shortly after his arrival, the agents identified themselves as Special Agent Jarid Pfalzgraf of the FBI and Task Force Officer Carlos Villalona of the City of Miramar Police Department.  Although their affiliation with a federal law enforcement agency was clear, the agents wore plain clothes and concealed service weapons.

Less than one minute after introducing themselves, they invited Chavez to speak with them in their unmarked police cruiser so that their conversation, which they indicated to be of a "private" nature, could be recorded without unnecessary auditory interference.  The three men then entered the vehicle – Chavez sat in the front passenger seat with Pfalzgraf seated to his left and Villalona seated in the second row – and began conversing in the presence of a recording device.   The audio recording of this encounter, which is approximately 48 minutes long and was

admitted at the hearing as Government Exhibit No. 1, speaks for itself.[2]  Therefore, the Court summarizes its contents only for the sake of context.

The Government describes the tone of this interview as "friendly" and "relaxed."  Although that may be true with respect to the speech patterns of the agents, we cannot agree that those adjectives accurately describe the utterances of Chavez – a young man whose soft-spoken voice sounds confused, depressed, anxious, and, by the end of the encounter, ultimately defeated.

The interview of Chavez was primarily conducted by Pfalzgraf, who assigned notetaking responsibilities to his partner in the back seat.  At the beginning, Pfalzgraf informed Chavez that he was not under arrest, that he was "free to go" at any time, and that if he did not want to talk to them then he should know that the vehicle door was unlocked because they were not going to stop him from leaving.  At the hearing, Pfalzgraf acknowledged that this was a truthful representation because, at the time he said it, he did not believe that he had probable cause to arrest Chavez or to obtain a search warrant for any of Chavez's property.

After making that disclaimer, Pfalzgraf asked whether Chavez knew the purpose of their visit.  Chavez said that he was told it had something to do with him being on land that he was not supposed to be on.  A bit flummoxed by this response, Pfalzgraf clarified that they were investigating a tip received from the National Center for Missing and Endangered Children.

---

[2]     Government Exhibit No. 3, an unofficial transcript of this audio recording, was also admitted into evidence without objection.  Although the transcript is not perfect, it is mostly accurate.

"Do you have any idea what that's in reference to?" asked Pfalzgraf.

"None at all," replied Chavez.

Pfalzgraf noted around this time that he wasn't going to "bullshit" Chavez and, to that end, he informed Chavez that he probably knew "a lot of the answers to the questions" he planned to ask.  Therefore, Pfalzgraf said, he would be able to gauge how "truthful" Chavez was being with his inquisitors.

Pfalzgraf then explained that he would soon focus on the real reason for their visit, but first he wanted to ask some background questions about Chavez's typical internet usage.  Chavez discussed his use of Instagram; he also explained that, despite living with his mother and stepfather, he paid for his own internet service provider because his stepfather wanted him to be "independent."  They also discussed Chavez's interest in landscape photography, and Chavez explained that he owned a high-quality camera to fulfill this hobby.  The conversation then shifted toward the primary purpose of the federal government's visit to Chavez's doorstep.

"Are you familiar with the name Riley Claire?" asked Pfalzgraf.

"Um," Chavez said with hesitation.

"Remember what he walked about, man?  When we started, I said I probably know some of the answers to these questions, and I want to gauge your honesty and how this is going to go for you today," reiterated Pfalzgraf.

Chavez then said that he understood the name Riley Claire to refer to some sort of teen model whose images had been circulating online.  Explaining that he did not know her personally, Chavez then discussed how he was familiar with her images

and how he believed that her images may have been generated by someone named "Grant" – another individual who Chavez was familiar with because he had seen Grant's profile on Instagram.  The topic of Riley Claire led into a deeper conversation about Chavez's online interactions with Grant, which resulted in Chavez's acquisition of the Riley Claire photos and Chavez's subsequent sale of those photos though an Amazon account that he controlled.

Throughout this portion of the interview, Chavez repeatedly told Pfalzgraf that he did not know (or otherwise could not remember) the answers to Pfalzgraf's questions.  In response, Pfalzgraf reminded Chavez that he already knew the answers and so he knew that Chavez's truthfulness was not "quite on point."  Absorbing these reminders, Chavez reluctantly elaborated about why and how he sold the Riley Claire photos and what electronic devices he had inside his home.  Around the 14-minute mark, after Villalona pressed Chavez to be specific about what type of iPhone he used, Chavez quietly admitted that he could "assume that [he was] being arrested."

"Well, we were hoping not to, depending on your cooperation level. But right now, not necessarily getting that from you," replied Pfalzgraf.  Seizing upon Chavez's fear that he would be arrested, Pfalzgraf then explained how he simply wanted Chavez to give them his electronic devices for their review.  Provided such a result occurred, Pfalzgraf insinuated that he and Villalona might depart without arresting Chavez.

Pfalzgraf then proceeded to ask Chavez about his pornographic preferences and sexual fetishes.  Pfalzgraf reassured Chavez that his sexual interests seemed

pretty "mainstream" before transitioning into questions about obscure websites, ambiguous acronyms, and Chavez's banking information.

"So, how much have you actually made selling these types of photographs online since, let's say, July 2018 – to throw a random number out there?" asked Pfalzgraf.

"I wouldn't know," replied Chavez.

"No? More than two dollars?" Pfalzgraf inquired.

"Something like that," conceded Chavez.

"Something like what, man?" Pfalzgraf chortled. "We're trying to be decent with you dude, but you gotta – we know the answers.  I mean, you're bullshitting with us."

"Well, you know the answers," said Chavez, "and I know where this is headed."

"You don't," retorted Pfalzgraf. "Because believe me: It's Friday afternoon; we don't want to have to make an arrest right now."

Villalona giggled as Pfalzgraf reiterated that they would prefer Chavez cooperate because such cooperation would allow them to put in a good word about Chavez with their prosecutor.

"But we both know that's not how this works," declared Chavez.

"That is precisely how this works," said Pfalzgraf.  He then explained how he could not promise that he would not arrest Chavez at some point in the future; however, if Chavez cooperated that afternoon by consenting to the seizure and search of his electronic devices, then Chavez could avoid spending his weekend in jail.

Pfalzgraf continued to elicit incriminating statements from Chavez until the 36-minute mark, when Chavez changed his story and admitted that he still possessed the photos of Riley Claire that grabbed the FBI's attention. Then the bargain between Chavez and the FBI fully crystallized.

"So, here's what I'd like to do today, Doug," said Pfalzgraf, "and you can tell me if you think this is fair. So, obviously some of the stuff that you've done drew our attention here, and we already kind of have a case built in that sense. And you don't want to go to jail, right? I don't want to take you to jail. So, I think we're both in the same boat there. But what I need to do in order to do that is, obviously, I've got this information from you, which is helpful, but I am going to need to get those devices that have those pictures, right? So, that being phone, hard drive, um PlayStation. So, those are – that's kind of you're – what you're looking at today. You're looking at, you know, take a ride with Carlos and I, which I'm guessing you don't want to do, or we can fill out some paperwork, if you consent to letting us take those devices and look through them, and we're going to go about our merry way, enjoy our weekend, and you can do the same as much as you can. Does that sound fair?"

Chavez nodded in agreement.[3]

"All right," said Pfalzgraf.

Near the end of the recording, Chavez was presented with a written consent form. Pfalzgraf explained that they would begin filling out the consent form in the

---

[3]    There is a brief silence in the audio recording at this juncture. Based upon Pfalzgraf's uncontradicted testimony and a logical inference relating to Pfalzgraf's next utterance, we conclude that Chavez non-verbally agreed with Pfalzgraf that this arrangement sounded fair.

police cruiser because they wanted to "save some time inside" and thereby avoid Chavez's mother asking "a million questions" during the search of the home. Pfalzgraf therefore confirmed that Chavez had his own bedroom with a door that could be closed before he asked for the passwords to all of Chavez's electronic devices. Chavez articulated those passwords

"Is there any way where I could, um, on my phone, get my lawyer's phone number?" Chavez then asked.

Pfalzgraf responded that, because Chavez was working with them, he would "gladly" allow Chavez to find his lawyer's phone number.  But instead of clarifying whether Chavez wanted to consult with his lawyer before consenting to a search, Pfalzgraf quickly pivoted back to the contents of the consent form, adding that they would fill in the portions of the form pertaining what specific property was going to seized and searched after they were inside Chavez's home.  After the search and seizure was complete, therefore, Chavez would be asked for his signature.  Pfalzgraf then asked Chavez whether, before they went inside, he wanted to read the consent form.

"My career is down the toilet, isn't it?" replied Chavez.

"Why?" asked Pfalzgraf.

"Because you both know that you guys are going to arrest me," he said.

"I'm not," said Pfalzgraf.

"Maybe not today," he murmured.

Pfalzgraf then reassured Chavez that, although it was possible that he could be arrested in the future, that arrest would be a consequence of what images were found on Chavez's electronic devices.  Pfalzgraf further distinguished between child pornography and child erotica, stating that Chavez had described being in possession of only the latter and that such possession was not illegal.

"Now, if we find child pornography on there, which is kids explicitly exposing their genitals, then yeah – you're probably going to take a ride on another date," concluded Pfalzgraf.  "But if all you have is teenagers posing provocatively in swimsuits, I'm going to tell you it's unlikely."

After that admonition, the three men exited the vehicle and approached Chavez's home.  Chavez unlocked his front door, led the agents into his bedroom, and provided them with 11 electronic devices.  The agents then carried the devices outside to inventory them because, as Pfalzgraf explained at the hearing, Chavez's bedroom was cramped, dark, and dirty.   Chavez, who was present during the inventory process, then signed the written consent form that was shown to him before the agents entered his home, which provided, among other things:

> I have been advised of my right to refuse consent to this search, and I give permission for this search, freely and voluntarily, and *not as the result of threats or promises of any kind*.  I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals.

[D.E. 37-1] (emphasis added).  A subsequent search of the seized devices revealed numerous photos and videos that depicted pre-pubescent minors being sexually exploited or otherwise exposing their genitalia.

Pfalzgraf discussed these photos and videos in an affidavit that he submitted is support of a criminal complaint application on March 8, 2022.  Finding that Pfalzgraf's affidavit established probable cause to criminally charge Chavez for possession of child pornography, United States Magistrate Judge Alicia Otazo-Reyes issued the criminal complaint.

Villalona again discussed these photos and videos in an affidavit that he submitted in support of a search warrant application on March 16, 2022.  Chavez was arrested pursuant to the criminal complaint on March 9, 2022, and the Government seized his iPhone at that time.  Thus, in applying for the search warrant, the Government sought a license to search that iPhone as well as the other 11 devices previously seized with Chavez's "consent."  Finding that Villalona's affidavit established probable cause to search Chavez's devices, United States Magistrate Judge Alicia O. Valle issued the warrant.

All of the seized devices have since endured a thorough forensic examination, and the Government intends to introduce the evidence derived from these searches against Chavez at trial.  Chavez, who stands accused by indictment of possessing child pornography in violation of 18 U.S.C. § 2252, now seeks to suppress the evidence derived from his devices because it was acquired in violation of the Fourth Amendment.  For the reasons discussed below, we are unable to grant him the relief that he seeks.

## II.   ANALYSIS

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotations omitted).  At the very core of the Fourth Amendment is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Accordingly, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

By its plain language, however, the protection of the Fourth Amendment extends beyond the home.  As the Supreme Court has recognized, it also covers "effects" that would have seemed alien to our founding generation – i.e., the Fourth Amendment generally protects information that exists on an individual's electronic devices. *See Riley v. California*, 573 U.S. 373, 386 (2014) ("We therefore decline to extend [the search incident to arrest doctrine] to searches of data on cell phones, and hold instead that officers must generally secure a warrant before conducting such a search.").

It is therefore well-established that warrantless searches by law enforcement are "*per se* unreasonable" in the absence of "exigent circumstances." *See, e.g., Horton*

11

*v. California*, 496 U.S. 128, 138 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 470-71 (1971)). Although not considered an exigent circumstance, it is similarly well-established that a search or seizure conducted pursuant to an individual's consent does not offend the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017).

A consensual search is constitutional so long as the individual's consent is voluntary – i.e., the product of an "essentially free and unconstrained choice." *Bustamonte*, 412 U.S. at 225.  Voluntariness is not susceptible to a neat, talismanic definition; rather, the Court must determine voluntariness based on the totality of the circumstances.  *Spivey*, 861 F.3d at 1213.  An inexhaustive list of the factors bearing on the voluntariness of an individual's consent includes the following: (1) the voluntariness of the individual's custodial status; (2) the presence of coercive police procedure; (3) the extent of the individual's cooperation with police; (4) the individual's awareness of his right to refuse consent; (5) the individual's education and intelligence; (6) whether the police engaged in deceit or trickery to obtain the individual's consent; and (7) the individual's belief that, if he grants the police his consent to search, then the police will not find incriminating evidence. *Id*.

Because "[n]othing can destroy a government more quickly that its failure to observe its own laws," evidence derived from a Fourth Amendment violation generally cannot be admitted in a criminal trial. *See Mapp v. Ohio*, 367 U.S. 643, 659-60 (1961); *see also, e.g., Olmstead v. United States*, 277 U.S. 438, 485 (1928)

(Brandeis, J. dissenting) ("Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.").

When the Government relies on an individual's consent to comply with its Fourth Amendment obligations, it is the Government's burden to show that the consent was voluntary. *United States v. Yeary*, 740 F.3d 569, 581 (11th Cir. 2014). Chavez argues that, because the Government failed to obtain his consent to enter his home and seize and search his electronic devices, the subsequent searches of those devices violated the Fourth Amendment. Therefore, submits Chavez, the evidence derived from those searches must be suppressed.

To meet its burden, at the hearing, the Government introduced into evidence, without objection, Government Exhibit No. 2 – the written consent form signed by Chavez. Chavez does not dispute the authenticity of this consent form, nor does he dispute that he signed the form at the conclusion of the inventory process. This consent form provides, however, that Chavez signed it freely and voluntarily – not as the result of "threats or promises of any kind." Because the audio recording clearly reveals that Chavez may have signed it in response to a *threat* that he would be arrested that afternoon and a *promise* that he would not be arrested that afternoon if he provided the Government with his consent, the Court finds that this written consent form is not dispositive of whether Chavez's consent was voluntary.

13

The Government concedes that Chavez never verbally consented to the search of his home prior to the agents' entry.  But the agents' uncontradicted testimony at the hearing supports our finding that Chavez's non-verbal affirmation – i.e., nodding in agreement – as well as his act of unlocking his front door and leading the agents into his bedroom sufficiently indicates that he "consented" to the search before the search took place.

To obtain this "consent," however, the agents implied that they had probable cause to arrest Chavez that afternoon and would do so if he refused to grant his consent.  Indeed, after acknowledging that the FBI already had a case built against Chavez, Pfalzgraf presented him with an unambiguous choice: "You're looking at, you know, take a ride with Carlos and I, which I'm guessing you don't want to do, or we can fill out some paperwork, if you consent to letting us take those devices and look through them, and we're going to go about our merry way – enjoy our weekend and you can do the same as much as you can. Does that sound fair?"

Chavez nodded in agreement.

This bargain weighs against the Government in our totality of the circumstances analysis.  Accordingly, we begin our consideration of the *Spivey* factors by inquiring as to whether this bargain amounted "deceit" or "trickery" by the FBI.

### A.    *The threat to arrest Chavez was justified, and it was therefore not deceitful because it did not amount to a threat of illegitimate government action.*

Chavez made a deal with the FBI, who then promptly required him to disclaim that agreement in writing.  Without passing on the wisdom of this agreement, we

14

acknowledge that the terms were indisputably clear: In exchange for Chavez's consent to allow the Government to seize and search his electronic devices, which the parties understood to be located inside Chavez's bedroom, Pfalzgraf and Villalona would not arrest Chavez that afternoon.[4]

Chavez cites no precedent that directly supports the argument that, where a law enforcement officer can make a valid arrest of an individual but elects to temporarily refrain from doing so in exchange for the individual's consent to seize and/or search that individual's property, the consent provided is therefore involuntary.  Indeed, Chavez acknowledges that it is a totality of the circumstances analysis, and our review of the relevant case law indicates that such a bargain does not necessarily vitiate the consent obtained.  *See, e.g., Yeary*, 740 F.3d at 581-83 (finding that the defendant's consent to warrantless searches of his home in exchange for pretrial release was voluntary); *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989) ("Even if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion. Long was free to force the agents to obtain a search warrant and, if at that time, he did not want 'his whole place dug up,' Long could have cooperated.").

---

[4]     Neither Pfalzgraf nor Villalona said that they would be entering the home absent Chavez's consent. Although Chavez certainly understood from the conversation that he was under investigation, the agents never indicated that they would have been justified in entering Chavez's home that afternoon without Chavez's permission. Accordingly, this is not a case where law enforcement officers misrepresented their authority to lawfully search an individual's home without the individual's consent so as to obtain the individual's consent.  *See generally, e.g., Bumper v. North Carolina*, 391 U.S. 543 (1968).

Where the threat of arrest is unjustified and amounts to a misrepresentation by a law enforcement officer, however, at least one court has determined that providing consent in exchange for avoiding arrest can render the consent involuntary. *See United States v. Munoz*, 987 F. Supp. 2d 438, 447-49 (S.D.N.Y. 2013); *see also United States v. Ortiz*, 943 F. Supp. 3d 447, 456-58 (S.D.N.Y. 2013) (finding that a police officer's unjustified threat to arrest the defendant's mother if the defendant did not confess to unlawfully owning a firearm recovered in the mother's apartment rendered the confession involuntary); *United States v. Contreras-Del Toro*, 892 F. Supp. 159, 160 (S.D. Tex. 1995) ("What renders a confession involuntary is not *any* threat or promise, but rather a threat or promise of illegitimate action.") (emphasis in original); *Kent v. United States*, 272 F.2d 795, 799 (1st Cir. 1959) ("Petitioner must show that he was subjected to threats or promises of illegitimate action.").

In *Munoz*, the police arrested the defendant after they caught him selling marijuana out of a minivan in the Bronx. 987 F. Supp. 2d at 440. The defendant was taken to the police station and questioned about his general knowledge of the criminal enterprises in the borough. *Id.* During this interview, the police began to suspect that the defendant, a convicted felon, unlawfully possessed a firearm. *Id.* at 440-41. Accordingly, a group of police officers went to the defendant's home without the defendant in the hope that the relatives with whom the defendant shared the residence would consent to a search for the firearm. *Id.* at 441-42. Meanwhile, the defendant was informed that, if he did not consent to the search and the police ultimately found a firearm in the home, all of his roommates – including the

16

defendant's elderly father – would be subject to arrest. *Id*. The defendant consented to the search only after receiving assurances that the defendant's father would not be arrested. *Id*. The court found, however, that this threat to arrest the defendant's father was unjustified because the police lacked a sufficient factual basis to conclude that anyone other than the defendant constructively possessed the firearm under New York law. *Id*. at 447-49. Accordingly, the representation that the police could have arrested the defendant's father was false. *Id*. Therefore, the court held that this misrepresentation was unduly coercive and vitiated the defendant's consent, necessitating suppression of the firearm that was found among the defendant's possessions. *Id*.

Accordingly, we must determine whether Pfalzgraf's threat to arrest Chavez if he did not consent was justified by his lawful authority to effect that arrest. Put differently, was this objectively more than an empty threat?

Pfalzgraf stated without qualification at the hearing that, when he began interviewing Chavez on that fateful Friday afternoon, he did not believe that he had probable cause to arrest Chavez or to obtain a search warrant for Chavez's home and electronic devices. Based upon the dearth of evidence provided by the Government concerning what it knew about Chavez before he was interviewed by the agents, we find that Pfalzgraf's subjective belief about his lack of probable cause to be consistent with an objective review of the matter. Before the interview, the Government did not have probable cause to arrest Chavez.

Because the agents' visit to Chavez's home was prompted by a tip concerning a collection of approximately 80 photos depicting a minor named "Riley Claire," we begin by considering whether the agents had probable cause to believe that any of the images in the Riley Claire portfolio qualified as child pornography. At the hearing, the Government argued that one (and only one) image in the Riley Claire portfolio qualifies as "child pornography" under the law. Thus, we address only this photo and assume that the balance of the portfolio does not qualify as child pornography.

The Government did not offer this photo into evidence. Accordingly, the Court's role as factfinder with respect to this photo is limited to the ways in which the parties have described it. There is no dispute that this photo depicts a 13-year-old girl wearing a "G-string bikini." She is lying face-down on a bed with her buttocks raised in the air. The picture focuses on her raised buttocks and genitalia, which is "barely covered" by the G-string bikini.

Several considerations guide our inquiry regarding whether this particular Riley Claire photo qualifies as child pornography. First, to reiterate, the Government did not offer the photo into evidence. It is the Government's burden to prove this fact because it is their burden to prove Chavez's consent and this fact weighs heavily into the calculus of Chavez's consent. We can respect the Government's decision to avoid further publication of this image because of privacy concerns, but this decision effectively makes it more difficult for the Government to satisfy its burden because it is asking us to define an image as child pornography without showing us the image. *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J. concurring) ("I know

18

[hard-core pornography] when I see it, and the motion picture involved in this case is not that.").

We cannot say that all G-strings are created equal. Some may be manufactured with enough material to sufficiently obscure a person's anus, genitals, and pubic area; others may not and therefore leave too little to the imagination. The fact that the child in the photo is wearing the same G-string bikini in the entire portfolio – but that only one of these photos arguably qualifies as child pornography in the Government's view – suggests to us that the clothing worn in the photo at issue may be sufficient to qualify this photo as child erotica instead of child pornography.[5]

Second, Pfalzgraf represented to Chavez during the interview that the photo was *not* child pornography; rather, after extensively discussing the Riley Claire portfolio and learning from Chavez that he still possessed those images on his MacBook, Pfalzgraf told Chavez that these photos fell under the umbrella of child erotica and were not child pornography.

It is difficult to discern whether that representation was honest or instead some sort of subterfuge designed to coerce Chavez. Pfalzgraf testified that, at the beginning of the interview, he did not have probable cause to arrest Chavez or to

---

[5]     "Child erotica" is material that depicts children and is sexual in nature but nevertheless fails to meet the statutory definition of child pornography. *United States v. Vergara*, 884 F.3d 1309, 1314 (11th Cir. 2018) (Pryor, J. dissenting); *Thomas v. United States*, 775 F. App'x 477, 479 (11th Cir. 2019). In *United States v. Edwards*, a Tenth Circuit panel including then-Judge Gorsuch held that an image of an underage girl wearing "thong underwear" that "barely cover[ed] her genital area" qualified as child erotica and therefore was not child pornography. 813 F.3d 953, 958 (10th Cir. 2015).

obtain a search warrant for his devices; he also testified, however, that this Riley Claire photo *was* child pornography.[6]

Until Chavez confirmed that he was still in possession of the Riley Claire photos, Pfalzgraf was very coy about his authority to arrest Chavez. At the 14-minute mark, when Chavez initially brought up his fear of arrest, Pfalzgraf replied that he was "hoping to not" arrest Chavez. When the subject was broached again around the 23-minute mark, Pfalzgraf similarly talked about the prospect of arrest being a "potential" activity that he did not want to engage in rather than an act he had the authority to do in that moment. And by the 34-minute mark, when Pfalzgraf referred to his desire to uphold his end of the "bargain," Pfalzgraf was expressly asking for Chavez's honesty instead of his consent to search. Therefore, this statement can reasonably be interpreted as a reference to Pfalzgraf's stated desire for he and Chavez to not "bullshit" each other as Pfalzgraf so eloquently put it at the beginning of the interview.

Immediately after Chavez revealed that he still had the Riley Claire photos, however, Pfalzgraf's rhetoric about his authority to arrest escalated into an unambiguous *quid pro quo*. By the 37-minute mark, an arrest was no longer a potential activity that Pfalzgraf did not want to engage in; it was an activity that Pfalzgraf would carry out if Chavez refused to consent to the search. This abrupt shift in rhetoric indicates that the agent may have believed at that moment that the Riley Claire photo at issue was child pornography because, upon learning that

---

[6]     Pfalzgraf did not testify as to whether, at some point *during* the interview, he believed that he learned sufficient facts to establish probable cause to arrest Chavez.

Chavez still possessed the photo, Pfalzgraf was apparently emboldened to make an unambiguous show of his lawful authority for the first time.

Third, however, in seeking a criminal complaint against Chavez and a search warrant for his devices, the Government never expressly defined any of the Riley Claire photos as "child pornography."  In applying for the criminal complaint, Pfalzgraf stated that his interview of Chavez was prompted by the suspicion that Chavez possessed "explicit materials of minors."  And, in applying for the search warrant, Villalona described the Riley Claire portfolio as being connected with a tip regarding the production of "child sexual abuse material."

Their failure to define any of the Riley Claire photos as child pornography in these affidavits may be significant because it suggests to us, on the one hand, that the images comprising the Riley Claire portfolio are exclusively child erotica – i.e., imagery that Congress has not deemed unlawful to possess.  Indeed, if the photo is child pornography, why refrain from calling it that?  On the other hand, in both affidavits, the agents did not expressly refer to the materials found on Chavez's MacBook as "child pornography"; by contrast, they described in graphic detail the images recovered. In discussing the Riley Claire photos, Villalona's affidavit employed the same tactic of describing the imagery instead of labeling it.  In doing so, he allowed the judge to decide for herself whether there was probable cause to believe that these images qualified as unlawful child pornography.

The Government argued at the hearing that "child sexual abuse material" is synonymous with "child pornography" and so our decision here should be guided by

that syllogism; however, we cannot agree that that is necessarily true.  Congress defined "child pornography" in 18 U.S.C. § 2256 and made its possession a crime in 18 U.S.C. § 2252.  In our view, it would be error say that "child sexual abuse material" is necessarily synonymous with "child pornography" because the former term has not been defined by Congress and, from a textual perspective, it refers to a larger category of subject matter.  For example, imagine a photo depicting a minor female whose vagina is being penetrated by an inanimate phallic object.  Surely the photo qualifies as both "child pornography" under 18 U.S.C. § 2256 and as "child sexual abuse material" under any reasonable interpretation of the phrase.  But the inanimate phallic object, which undoubtedly qualifies as "child sexual abuse material" given that it is an instrument used to sexually abuse a child, cannot fit within Congress' definition of "child pornography" because it is not a visual depiction of sexually explicit conduct involving a minor.  One category is necessarily broader than the other.  The same distinction could be made between child pornography and child erotica because child erotica, although not child pornography, nevertheless can be material created through child abuse.  Accordingly, we are reluctant to put too much stock in how the Government has previously defined the Riley Claire photos.  Their choice to not label the photo in question as "child pornography" in two affidavits cannot, by itself, be dispositive of the issue.

Fourth, our reading of the relevant statutory language helps us settle the debate.  The statute indicates that, to qualify the Riley Claire photo at issue as child pornography, the photo must lasciviously exhibit her "anus, genitals, or pubic area."

22

*See* 18 U.S.C. § 2256(2)(A)(v) (defining "sexually explicit conduct"); 18 U.S.C. § 2256(8) (defining "child pornography" as a visual depiction of a "minor engaging in sexually explicit conduct"); *Lacivious*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining lascivious as conduct "tending to excite lust; lewd; indecent; obscene.").

It is undisputed that the G-string bikini worn by Riley Claire in the photo at issue "barely covered" her genitalia. According to basic principles of human anatomy, it follows that her pubic area was uncovered and therefore clearly exhibited. Nothing in the record suggests otherwise. And given our foregoing considerations as well as her posture in the photo, the focus of the image, and the circumstances surrounding how this photo was circulated online, the Court concludes that Pfalzgraf, or any reasonable officer in his position, could have had probable cause to believe that this photo qualified as child pornography. Indeed, Pfalzgraf's uncontradicted testimony confirms this belief.

Having found that Pfalzgraf had arguable probable cause to believe that this photo qualified as child pornography, the Court next considers what was known about Chavez's connection to this photo at the time that Pfalzgraf made his express threat of arrest. By the 37-minute mark, Pfalzgraf had probable cause to believe, at a minimum, that Chavez was still in possession of the photo and that Chavez previously sold the photo online. This means that, at least 37 minutes into his conversation with Chavez, Pfalzgraf had probable cause to believe that Chavez committed a felony offense.

We cannot say, therefore, that Pfalzgraf's direct and unambiguous threat to arrest Chavez was wholly unjustified because, in our view, he could have reasonably believed that he could have legitimately arrested Chavez at the time he made the threat. *See, e.g., United States v. Watson*, 423 U.S. 411, 417 (1976) ("The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony.") (quoting *Carroll v. United States*, 267 U.S. 132, 156 (1925)). Therefore, it weighs less heavily against the Government in our totality of the circumstances analysis than if the threat had been utterly baseless. *See, e.g., Long*, 866 F.2d at 405 (finding that it was not unduly coercive for law enforcement officers to threaten to get a search warrant if the defendant refused to consent to a search because the officers could have legitimately sought a search warrant).

### B.   At the time that Chavez provided his consent, he was involuntarily in Government custody.

At the beginning of the interview, Chavez was advised that he was not under arrest and was free to leave.  Pfalzgraf testified at the hearing that, at the time he advised Chavez that this interview was a consensual encounter, he did not believe that he had probable cause to make an arrest.  Chavez was in the front seat of an unmarked police cruiser, the conversation was being recorded for everyone's protection, the agents' service weapons were neither visible nor pointed at Chavez, and the agents' speech patterns were relaxed. We can therefore easily agree that, for most of the recorded conversation, a reasonable person would have felt free to terminate the encounter and exit the vehicle. *See United States v. Woodson*, 30 F.4th

24

1295, 1303 (11th Cir. 2022) (discussing how an individual's custodial status is determined in the *Miranda* context by asking whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.") (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)).

But given the direct, *quid pro quo* nature of the bargain presented by Pfalzgraf around the 37-minute mark, it is hard to conclude that a reasonable person would feel free to leave after that threat.  Chavez had two options: consent to the requested search or immediately endure the pain of a formal arrest.  When presented with those options, no reasonable person could feel that he was free to exit the vehicle unless he gave the agents exactly what they wanted.

Chavez could not terminate the encounter simply by opening the vehicle door and going about his business; if he opened that door, he was at liberty to go only one of two places – inside his home with the agents in tow or to the back seat of the police cruiser, where he would remain until he arrived at the local jail.  Because Chavez consented to the search of his home, the seizure of his electronic devices, and the search of those devices only after his liberty had been significantly restrained, this factor suggests that Chavez's consent was not the product of a free and voluntary choice.

### C.   *The record indicates that the agents employed limited coercive tactics to acquire Chavez's consent.*

Having already discussed the coercive impact of Pfalzgraf's threat to arrest Chavez if he did not provide his consent, we note two additional coercive factors at play during this encounter.

First, Pfalzgraf presented the interview as an honesty test. Because Pfalzgraf already "knew" most of the answers to the questions that he asked, he repeatedly persuaded Chavez to elaborate on incriminating subjects by accusing Chavez of dishonesty and hinting that negative consequence might flow from Chavez's lack of truthfulness. Notably, it is a crime to lie to an FBI agent. *See* 18 U.S.C. § 1001. And while the record does not reflect that Pfalzgraf ever advised Chavez of this reality, we also cannot presume that Chavez was unfamiliar with his obligation to be honest with federal investigators.

Second, the agents took affirmative steps to prevent Chavez from interacting with others during his decision-making process. At the beginning of the encounter, they asked to interview Chavez inside the police cruiser so that the "private" nature of the conversation could be maintained. Indeed, if they were to interview Chavez on his doorstep, there was a tangible risk that Chavez's mother might overhear something and then feel an obligation to protect her child by telling him to stop speaking with law enforcement agents. The agents later confirmed their desire to avoid the involvement of Chavez's relatives by ensuring that Chavez's bedroom door could be closed so as to prevent Chavez's mother (or anyone else) from asking "a million questions" about what was going on. The agents' desire to sequester Chavez as he considered whether to grant his consent is further confirmed by the fact that they made no effort whatsoever to determine whether Chavez wanted to immediately speak with his lawyer after Chavez expressed his desire to retrieve his lawyer's phone number before his electronic devices were seized.

26

Nevertheless, we find that these factors do not weigh heavily against the Government. At the outset of the interview, Pfalzgraf made it perfectly clear that Chavez had no obligation to participate in an honesty test. Chavez could have declined to present himself for examination. Although it is a crime to lie to the FBI, it is generally not illegal to refuse to speak with them. And, in one way, the agents' desire to not air Chavez's "dirty laundry" in the presence of his family can be seen as a courtesy, not coercion. Moreover, they did not prevent Chavez from speaking with his lawyer. Chavez asked to retrieve his lawyer's phone number, and Pfalzgraf said that he would "gladly" permit that to happen.

### D.   *Chavez was very cooperative with law enforcement.*

Chavez was notified that the agents were looking for him at his home earlier in the day. Nevertheless, he chose to go home after work even though he would likely be greeted by the agents. He was under no obligation to do so. He could have instead found a local pub and stayed there. But he chose to go home and, after greeting the agents on his doorstep, he chose to be interviewed in their police cruiser. And after the subject of the conversation became obviously connected to Chavez's illicit online activity, he did not terminate the encounter despite Pfalzgraf's threshold acknowledgement that he was free to do so. His level of cooperation with the agents suggests to us that he voluntarily chose to cooperate with them, which in turn suggests that his ultimate decision to consent to the search of his home, the seizure of his electronic devices, and the search of those devices was also voluntary.

### E.      *Chavez was aware of his right to refuse consent.*

After the search of his home, Chavez signed a document wherein he acknowledged that he was informed of his right to refuse consent to that search.  He was not, however, verbally informed of this right before he led the agents inside.  Instead of verbally informing Chavez of his right to refuse, Pfalzgraf presented Chavez with the written consent form, gave a brief overview its contents, and explained that part of the form would be completed after Chavez's devices were inventoried.  Pfalzgraf then asked whether wanted to read the consent form before they went inside Chavez's home.

Chavez did not answer that question and instead talked about how his career was going "down the toilet" because the agents knew that he would be arrested.  It is therefore unclear whether Chavez actually read the portion of the form that advised him of his right to refuse consent before he led the agents inside.  But viewing his encounter with the agents in the totality, we conclude that Chavez was aware of this right.

The agents never indicated that they would be going inside Chavez's home without his permission.  Indeed, quite the opposite is true.  Chavez certainly understood that he could refuse consent because, by the 37-minute mark, Pfalzgraf informed Chavez that exercising his right to refuse consent would have a concrete consequence: Chavez's immediate arrest.  We therefore find that Chavez knowingly waived his right to refuse consent.

**F.      *Chavez's education and intelligence indicate that he was capable of making a voluntary choice.***

The record reflects that Chavez has a high school diploma.  He took courses at Miami-Dade College but never obtained his undergraduate degree.  The recorded interview evidences that Chavez has a fluent understanding of the English language, which was the language employed by the agents.  Nothing in the record reflects, and Chavez does not argue, that he is subject to some sort of mental impairment that compromises his ability to read, write, or make a voluntary choice.  Accordingly, we cannot find that his decision to consent to the search of his home, the seizure of his devices, and the search of those devices was involuntary because he lacks the minimum education and intelligence required to make a voluntary decision of this nature.

**G.      *Chavez could not have reasonably believed that no incriminating evidence would be found on his electronic devices.***

Although it is a close call, this factor indicates that Chavez's consent was involuntary because he presumably knew that incriminating evidence would be found on his electronic devices and he nevertheless let the FBI search through them. Holistically, the recording tends to prove that Chavez knew what was on the devices and was aware of the likely consequence of allowing law enforcement agents to rummage through this data – i.e., he would be arrested for possession of child pornography.  This suggests that he consented to the search not because he wanted to but because he felt that he really did not have a choice.

Before obtaining his consent to enter the home, however, Pfalzgraf went to great lengths to inform Chavez about the legal differences between child pornography and child erotica.  Then Pfalzgraf asked Chavez whether he was going to find child pornography on the devices and Chavez responded in the negative.  Evidence therefore exists to indicate that Chavez did not believe the agents would find incriminating evidence if he consented to the search.  But given that the agents ultimately found images on Chavez's MacBook that clearly fell within the scope of child pornography as Pfalzgraf defined it that afternoon, we are not persuaded that Chavez genuinely believed that his consent would result in no incriminating evidence being found.

## III.   CONCLUSION

Totality of the circumstances inquiries frequently involve a difficult balancing equation for courts to calculate.  This is certainly one of those cases.  On the one hand, Chavez's education, intelligence, awareness of his right to refuse consent, and extensive cooperation with law enforcement indicate that his consent was voluntary.  On the other hand, Chavez's semi-custodial status at the time he provided his consent as well as his subjective belief that providing such consent would result in the recovery of incriminating evidence suggests that his consent was not voluntary but rather the product of coercion.  But considering that Pfalzgraf's threat to arrest Chavez if he did not consent was not unjustified, and because the other coercive aspects of the encounter were minimal relative to other Eleventh Circuit cases that held consent to be voluntary, we find that Chavez's will was not overborne by the

Government in this case. *See, e.g., United States v. Espinosa-Orland*o, 704 F.2d 507 (11th Cir. 1983) (consent to search the defendant's vehicle was voluntary even though the defendant was lying face down in the grass and had a gun pointed at him when he consented); *United States v. Long*, 866 F.2d 402 (11th Cir. 1989) (consent was voluntary even though the police threatened to destroy the defendant's yard pursuant to a search warrant); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (consent to search an entire home was voluntary even though the defendant had just been arrested outside his home by 14 agents and, when he tried to consent to a partial search of his home, the agents informed him that that was unacceptable and they would instead get a search warrant); *Tukes v. Dugger*, 911 F.2d 508 (11th Cir. 1990) (consent was voluntary even though the defendant's education and intelligence were limited, he was not informed of his right to refuse consent, and he was being interrogated at the stationhouse when he provided his consent); *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993) (consent was voluntary even though it followed the defendant's arrest at gunpoint and the invocation of his right to remain silent); *United States v. Spivey*, 861 F.3d 1207 (11th Cir. 2017) (consent was voluntary even though police deceived the defendant to gain access to the interior of his home).

Therefore, we find that the Government has met its burden to show that Chavez's consent was voluntary.  Accordingly, we need not address whether the search can be justified under other exceptions to the Fourth Amendment's warrant requirement, such as exigent circumstances.  We also need not re-evaluate whether the criminal complaint and search warrant obtained weeks after the consensual

search were independently supported by probable cause.  For the foregoing reasons, the Court recommends that the Motion be **DENIED**.

Finally, the Court finds good cause to expedite the objections period. Accordingly, the parties have seven (7) days to serve and file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C v Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

DONE AND SUBMITTED in Chambers at Miami, Florida, this 3d day of November, 2022.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge